UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: | CASE NO. |
| **800 BOURBON STREET, LLC** | **14-12770** |
| | SECTION A |
| DEBTOR | CHAPTER 11 |

_____

| | |
|---|---|
| IN RE: | CASE NO. |
| **LOUISIANA INTERESTS, INC.** | **14-12772** |
| | SECTION A |
| DEBTOR | CHAPTER 11 |

## <u>REASONS FOR DECISION</u>

This matter came before the Court on the Motion to Determine Allocation of Purchase Price
of Real Estate Assets[1] ("Allocation Motion") filed by 800 Bourbon Street, LLC ("800 Bourbon")
and Louisiana Interests, Inc.  d/b/a Oz ("Oz").   Responses were filed by First Bank and Trust
("FBT")[2] and Bay Bridge Building Limited Company, LLC ("Bay Bridge").[3]  At the conclusion of
the hearing, the Court allowed the parties to file post-hearing briefs.   The Court took the matter
under advisement after submission of the briefs.

### I.  Findings of Fact

On October 15, 2014, 800 Bourbon and Oz filed voluntary petitions for relief under chapter
11 of the Bankruptcy Code (collectively "Debtors").  800 Bourbon owned a piece of immovable
property located at 800 Bourbon Street ("the Property").   Oz rented the Property and operated a

---

[1] 14-12770, P-248; 14-12772, P-373.

[2] 14-12770, P-272; 14-12772, P-397.

[3] 14-12770, P-274.

nightclub.  In addition to furniture, fixtures and inventory, Oz also owned a warehouse located at

1413 Lafitte St. ("the Warehouse").

Debtors filed a Joint Disclosure Statement and Plan of Reorganization which proposed a

package sale of substantially all of 800 Bourbon and Oz's assets. Under the proposed plan, a court

conducted  auction was to be held  in conjunction with the confirmation hearing.  The Court

approved the Disclosure Statement for the Second Amended Joint Plan of Reorganization

("Disclosure Statement")[4] on June 17, 2015.[5] The Disclosure Statement provides:

> Distributions under the Plan will be governed by the Allocation of Purchase Price to
> the Assets of each Debtor.  At the Confirmation hearing, the Debtors will present
> evidence and request that the Bankruptcy Court approve and adopt the following
> Allocation of the Purchase Price based upon the offer of Kirkendoll Management,
> LLC of $4,750,000 for the Sale of Assets:

| Assets of 800 Bourbon | Valuation | % of Purchase Price | Basis of Value |
|---|---|---|---|
| Building and Components | $3,600,000 | 75.79% | Most recent market offer for building |
| **Assets of Oz** | | | |
| 1413 Lafitte St. Warehouse | $325,000 | 6.84% | Purchase price in March 2013 |
| Furniture, Fixtures, & Equipment | $125,000 | 2.63% | Approximately 25% of Book Cost |
| Customer Base/Business Operations/Trademark | $700,000 | 14.74% | Between 1.5 and 2 times annual net cashflow |
| **Total Purchase** | $4,750,000 | | |

> In the event that a higher and/or better offer is presented by a Prevailing Bidder at
> the Auction, the Debtors will seek to have the Bankruptcy Court approve the
> same percentage allocation between the Assets of the Debtors.[6]

---

[4] 14-12270, P-171; 14-12772, P-291.

[5] 14-12770, P-176; 14-12772, P-299.

[6] 14-12270, P-171, p. 18-19; 14-12772, P-291, p. 18-19.

On June 17, 2015, the Court also granted Debtors' Motion for Sale of Property Free and Clear of Liens which provided procedures for the auction.[7]

FBT filed proofs of claim in the secured amount of $2,357,769.36 in the 800 Bourbon case and an unsecured claim in the same amount in the Oz case.[8] Bay Bridge filed a secured proof of claim in 800 Bourbon's bankruptcy case ("Bay Bridge claim") for $1,979,886.47. Debtors have filed objections to FBT and Bay Bridge's claims.

In addition, claims filed in the Oz case are estimated to be: 1) a secured claim of $260,000 filed by the Moores; 2) priority debt of $9,340.84 owed to the Internal Revenue Service or Louisiana Department of Revenue; and 3) administrative claims of $186,000.00; and unsecured claims of $156,000.00.

Claims filed in the 800 Bourbon case are estimated to be: 1) secured property taxes of $50,571.77; 2) administrative claims of $65,000.00; and 3) unsecured claims of $22,220.26.

The auction took place on July 22, 2015, directly prior to the confirmation hearing. The prevailing bid of $8,175,000.00 purchased the package of assets from both estates. On August 3, 2015, the Court approved the sale[9] and confirmed Debtors' Second Amended Joint Chapter 11 Plan ("Plan").[10]

800 Bourbon, Oz, and Quarter Holdings, L.L.C. executed a Sale of Movable Property transferring Oz's movables located at the Warehouse; goodwill; the name "Oz"; inventory, fixtures,

---

[7] 14-12770, P-175; 14-12772, P-298.

[8] 14-12770, claim 3; 14-12772, claim 4.

[9] 14-12770, P-242; 14-12772, P-366.

[10] 14-12770, P-240; 14-12772, P-361.

3

and equipment for $100 and "other good and valuable consideration."[11]  A second Sale of Property transferring the Warehouse and Property was also executed for "other good and valuable consideration."[12]  Neither act allocated the purchase price among the assets.

Debtors filed the Allocation Motion requesting division of the sale proceeds between the two (2) estates.  Debtors propose that $3,475,000.00 of the purchase price be allocated to 800 Bourbon and $4,700,000.00 to Oz.  Debtors base the allocation on an appraisal of the Property by Bradley D. Bird, MAI, SRA.[13]

FBT and Bay Bridge object to Debtors' proposed allocation because it differs from the formula Debtors proposed in their Disclosure Statement.  FBT and Bay Bridge contend that Debtors are equitably and judicially estopped from proposing an allocation of the price that differs from that represented in the Disclosure Statement.  Alternatively, Bay Bridge contends that Oz has a value of $1,547,082.00 based on the appraisal by Ellis J. Roussel, CPA, CVA, and the sales proceeds should be allocated between the two (2) estates based on this value.[14]

Debtors also argue that Bay Bridge is judicially estopped from objecting to Debtors' proposed allocation.  Debtors' assert that Bay Bridge did not reserve the right to object to allocation at confirmation; therefore, Bay Bridge is judicially estopped from objecting to Debtors' proposal.

---

[11] Exh. D5.

[12] Exh. D6.

[13] Exh. D2.

[14] Exh. 14.

## II. Conclusions of Law and Analysis

### A. Judicial Estoppel

Judicial Estoppel is an equitable principle dependent on the existence of three (3) factors: "(1) clearly inconsistent positions; (2) the court's acceptance of the previous position; and (3) absence of inadvertence."[15]

> The purpose of judicial estoppel is "to protect the integrity of the judicial process" by preventing parties from "playing fast and loose" with the courts. It is generally invoked where "intentional self-contradiction is being used as a means of obtaining unfair advantage in a forum provided for suitors seeking justice."[16]

Equitable estoppel, as opposed to judicial estoppel, involves the application of estoppel against a party based on inconsistent positions made not to a court, but an opponent.[17] For obvious reasons, the doctrine is limited because the opposing parties must be justified in its reliance.

### 1. Is Bay Bridge Judicially Estopped from Objecting to Debtors' Proposed Distribution?

Debtors aver that Bay Bridge is judicially estopped from challenging the allocation of the sale proceeds because the Confirmation Order provides:

> The Debtors and Bay Bridge Limited Company, LLC reserve all rights with respect to the Bay Bridge Escrow pending a determination with regard to the allocation of the proceeds of the Sale to the alleged collateral of Bay Bridge Limited Company, LLC.[18]

---

[15] *Id.* at 552 (citations omitted).

[16] *Id.*

[17] *Hargrove v. Tega Cay Development Co., Inc. (In re the Point Wylie Co.)*, 78 B.R. 453, 460 (Bankr.D.S.Carolina). *See also In re Atravasada Land and Cattle, Inc*., 308 B.R. 255, 273 (Bankr.S.D.Tex. 2008).

[18] 14-12770, P-240; 14-12772, P-361.

In the Disclosure Statement and Sale Motion, Debtors proposed to sell the packaged assets to a third party for $4,750,000.00 unless a higher or better offer was received. Assuming this offer was successful, Debtors proposed to divide the sale proceeds between the estates with $3,600,000.00 being allocated to 800 Bourbon and $1,150,000.00 to Oz.

The allocation assumed that FBT would be completely satisfied by 800 Bourbon. Given this assumption and that the other claims against the Oz estate totaled approximately $612,000.00, the allocation proposed in the Disclosure Statement was more than sufficient to satisfy the confirmation requirements for Oz. The amounts allocated to 800 Bourbon, $3,600,000.00 were thought, as of the Disclosure Statement approval hearing, sufficient to satisfy the claims of FBT, property taxes, administrative and unsecured claims.[19]

Following the solicitation of votes, Bay Bridge filed its secured proof of claim for $1,979,886.47. Based on the proposed allocation of $3,600,000.00, 800 Bourbon lacked sufficient funds to satisfy the secured claims of FBT, Bay Bridge, property taxes and administrative claims. In fact, after satisfying outstanding property taxes and the FBT claim, approximately $992,000.00 remained to pay Bay Bridge. The inclusion of Bay Bridge left no funds with which to pay administrative and unsecured claims of 800 Bourbon. Satisfaction of administrative claims is a requirement for confirmation.[20] Thus, 800 Bourbon's Plan could not be confirmed as proposed, and the sale and confirmation were jeopardized unless Bay Bridge consented to accept something less

---

[19] As of the Disclosure Statement hearing, the total claims against 800 Bourbon were approximately $2,795,000.00. Bay Bridge's proof of claim was not filed until 28 days after the Disclosure Statement was approved.

[20] Since Bay Bridge's debt is *in rem*, payment of less than the full amount of its claim was a possibility. However, payment of administrative debt is a critical concern. *See* 11 U.S.C. § 1129(a)(9)(A).

than payment of the secured value on its claim.[21]  Seven (7) days prior to confirmation, the parties

requested a hearing on this development.[22]  At the hearing, they proposed the following modification

to the Plan.[23]

Based on the sale price of $4,750,000.00, the parties agreed to place $1,649,000.00 in escrow

for Bay Bridge.  The escrow was comprised of funds from both the Oz and 800 Bourbon estates after

satisfying the secured claims for property taxes, Moore, FBT, an FBT escrow for disputed amounts,

and priority tax debt.   Approximately $175,000.00 was also retained by Debtors.[24]   800 Bourbon

reserved the right to challenge both the validity and amounts due to FBT and Bay Bridge.  The

escrow was also subject to challenge through the allocation process and on Objections to Claim.[25]

---

[21]  The excess funds Oz enjoyed were primarily due to 800 Bourbon's commitment to satisfy FBT from its sale proceeds.  By marshaling FBT's claim to 800 Bourbon's estate, Oz's unsecured debt was significantly reduced, generating a distribution for equity while still satisfying all claims in full.

[22]  On July 15, 2015, FBT filed a Motion to Vacate the Order Approving the Disclosure Statement.  Case 14-12770, P-207.

[23]  Based on the proposal, FBT made an oral motion to withdraw its Motion to Vacate Order Approving Disclosure Statement, which was approved by the  Court.  P-231, 233.

[24]  Left from this proposed distribution were payments to administrative class claims and unsecured creditors.  Of course, the administrative class is primarily composed of Debtors' counsel fees which could wave payment in full or in part to secure confirmation.  Nevertheless, the unsecured class expected full payment of their claims and was never noticed of Bay Bridge's last minute appearance in the case, a circumstance that substantially affected their rights.  The retained funds were sufficient to satisfy unsecured claims or a portion of the administrative claims in both estates.

[25]  Presumably, Oz contemplated recovery of a portion of the funds held in escrow based on the allocation contained in the Disclosure Statement.

By this Motion, Debtors seek to reduce the allocation of the proceeds attributable to 800 Bourbon from $3,600,000.00 to $3,475,00.00. In addition, Debtors are proposing the allocation of any proceeds in excess of $3,475,000.00 to Oz's estate. This proposed allocation will not provide sufficient funds to pay Bay Bridge, even if its claim is reduced to $1,649,000.00.  It will also be insufficient to pay the administrative and unsecured claims of 800 Bourbon as they may only be paid after full satisfaction of the secured claims of Bay Bridge.  Debtors may argue that Bay Bridge took this risk at confirmation, but neither the administrative claimants nor the unsecured classes of 800 Bourbon or Oz were provided with information to advise them of this possibility.

The Court finds that the plain language of this provision does not preclude Bay Bridge from objecting to Debtors' proposed allocation.  Bay Bridge made it clear at the confirmation hearing on July 22, 2015, that it reserved its right to contest any proposed allocation.[26]  The Court also finds that Bay Bridge is not objecting to the terms of the confirmation order but seeking its enforcement.  The parties contemplated an allocation hearing with the ultimate decision being made by the Court.  For the reasons more fully explained below, the Court holds that Bay Bridge's initial, rather than alternative,  position is consistent with the terms of the Plan and does not constitute a challenge to it.[27]

### 2.  Are Debtors' Judicially or Equitably Estopped from Proposing an Allocation Which Varies from that Contained in the Disclosure Statement?

### a.  Are Debtors' Positions Inconsistent?

The Plan contemplated a sale of substantially all of both Debtors' assets.  The assets were offered as a package because Debtors' believed this would bring more in the marketplace than either

---

[26] Case 14-12770, P-296, Tr. T. 7/22/15, p. 23, ll. 24-25, and p. 24, ll. 1-4.

[27] Even if Bay Bridge were estopped from challenging the Allocation Motion, FBT is not.

8

a piecemeal sale of each asset or two (2) separate *en globo* sales of Oz and 800 Bourbon's assets.

Prior to confirmation, Debtors obtained an offer to purchase the packaged assets for $4,750,000.00.

Despite the receipt of this offer, Debtors proposed an auction at confirmation using the initial offer

as the floor on the purchase price. Debtors then set up bidding and sale procedures through a

Motion to Sell.

Debtors' Plan provided that the results of the auction would be approved by the Court

simultaneously with confirmation. Whatever the results, Debtors' Disclosure Statement provided

a methodology for a division of any sale proceeds. The division was based on the relationship the

appraised value of each asset bore to the total appraised value of the assets sold. In the Disclosure

Statement, Debtors provided the appraised value of each asset and the percentage it bore to the

whole. Debtors also represented that following a sale, they would request the Court allocate the

proceeds accordingly.

Debtors have requested an allocation which differs from this formula. In doing so they assert

that the Disclosure Statement does not create a binding obligation upon them to adhere to its

contents. Further, because the sale price greatly exceeds appraised value, Debtors argue that an

allocation based on appraisals is not rational. Debtors argue that each component asset does not

produce a proportionate and consistent return in relation to the others in the package. As a result,

they urge the Court to allocate the sale proceeds based on the potential each asset has to produce a

value or profit greater than its present market value. They also seek to reduce the appraised value,

or starting point, for the 800 Bourbon asset.

Because Debtors' proposed methodology for distribution of the proceeds so clearly deviates

from that contained in the Disclosure Statement, the issue before the Court is whether or not

representations in the Disclosure Statement as to the methodology of allocation are binding on

Debtors.  If so, Debtors may be judicially estopped from proposing an allocation different from that contained in their Disclosure Statement.

It is axiomatic that a plan creates a binding contract between a debtor and its creditors.[28] However, plans rarely contain the details or mechanisms by which they will be implemented.  The disclosure statement is the debtor's opportunity to explain to the creditor classes not only why they should support the reorganizational effort, but the debtor's position on the effect of plan terms and the mechanics of implementation. For this reason, Chapter 11 debtors are required to file both a disclosure statement and plan of reorganization.

The disclosure statement must contain "adequate information" sufficient to "enable [ ] a hypothetical investor of the relevant class to make an informed judgment about the plan."[29]

> [I]n determining whether a disclosure statement provides adequate information, the court shall consider the complexity of the case, the benefit of additional information to creditors, and other parties in interest, and the cost of providing adequate information."[30]

As the Fifth Circuit explains, "[T]he disclosure statement is the primary notice mechanism informing a creditors' vote for or against a plan."[31]  It is also why the Fifth Circuit has found it proper to consult the disclosure statement as well as the plan when deciding if judicial estoppel is applicable to a particular position.[32]

---

[28]  11 U.S.C. § 1141(a).

[29]  11 U.S.C. § 1125(a)(1).

[30]  *Id.*

[31]  *Spicer v. Laguna Madre Oil & Gas II, LLC (In the Matter of Texas Wyoming Drilling, Inc.*), 647 F.3d 547, 551 (5th Cir. 2011).

[32]*Texas Wyoming Drilling*, 647 F.3d at 550.

10

*Hargrove v. Tega Cay Development Co., Inc. (In re the Point Wylie Co.)*[33] illustrates why a disclosure statement may bind a plan proponent.  In *Hargrove*, a secured creditor of the debtor proposed a plan and disclosure statement.   Under the terms of the plan, the secured creditor/proponent placed itself in a separate class and provided that its secured claim would be satisfied from its collateral.   The unsecured class received a finite sum to be split *pro rata* among the members of the class based on the amount each member's claim bore to the aggregate debt in the class.  The disclosure statement explained both this mechanism for dividing the pool between unsecured claimants as well as an estimate of the total unsecured claims in the class and the percentage distribution each might receive.  Neither the plan nor the disclosure statement discussed the secured creditor's right to or reservation of a deficiency claim.  Neither discussed the secured creditor's participation in distributions to the unsecured class.

After confirmation, the secured creditor/proponent sold its claim to a third party.  That entity filed a very large deficiency claim which substantially diluted distributions to the unsecured class.  Another unsecured creditor objected, arguing that the creditor's inclusion in the unsecured class was inconsistent with its disclosure statement.  Specifically, inclusion of a deficiency claim was contrary to the creditor/proponent's representations both as to the aggregate amount of claims in the class and the anticipated share each might receive from the amounts available for distribution.

The *Hargrove* Court found that the creditor/proponent and its successor were judicially "estopped from  participating in distributions to unsecured creditors because the three disclosure statements- each proposed by [that creditor] and approved by the court- represented that [it] had no

---

[33] *Hargrove v. Tega Cay Development Co., Inc. (In re the Point Wylie Co.)*, 78 B.R. 453 (Bankr.D.S.Carolina).

unsecured claim for the purpose of voting, confirmation and distribution."[34]  The Court found that

the plan proponent could not change positions when there was an absence of language in the

disclosure statement that it could have included.

The positions taken by 800 Bourbon and Oz in the Disclosure Statement and Allocation

Motion are clearly inconsistent with the position they now assert.  Nevertheless, Debtors' argue that

the Plan and Disclosure Statement contain language that allows them to modify their position.

Debtors' Disclosure Statement contains the following disclaimer:

> APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE
> AN ENDORSEMENT OF OR DETERMINATION BY THE BANKRUPTCY
> COURT AS TO THE FAIRNESS OR THE MERITS OF THE PLAN OR A
> GUARANTY OF THE ACCURACY AND COMPLETENESS OF THE
> INFORMATION CONTAINED HEREIN.  APPROVAL OF THE DISCLOSURE
> STATEMENT MEANS THAT THE BANKRUPTCY COURT HAS FOUND THAT
> THE DISCLOSURE STATEMENT CONTAINS ADEQUATE INFORMATION
> TO PERMIT CREDITORS AND EQUITY HOLDERS OF THE DEBTORS TO
> MAKE A REASONABLY INFORMED DECISION IN EXERCISING THEIR
> RIGHT TO VOTE UPON THE PLAN.[35]

The Court agrees that the Disclosure Statement "does not constitute an endorsement or

determination by the Bankruptcy Court."  However, Debtors represented that *they* would propose

the same allocation as contained in the Disclosure Statement.   While the Bankruptcy Court is free

to make a determination as to whether or not it will accept the proposed allocation, Debtors' clearly

represented that they would support a specific proposal.

Debtors also point to the following language contained in the Disclosure Statement:

> THE STATEMENTS CONTAINED IN THE DISCLOSURE STATEMENT ARE
> MADE AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED
> IN THIS DISCLOSURE STATEMENT.   THE DELIVERY OF THIS

---

[34] *Point Wylie Co.,* 78 B.R. at 459.

[35] 14-12770, P-171, p. 7-8; 14-12772, P-291, p. 7-8.

> DISCLOSURE STATEMENT SHALL NOT UNDER ANY CIRCUMSTANCES
> CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE
> FACTS SET FORTH IN THIS DISCLOSURE STATEMENT SINCE THE DATE
> OF THIS DISCLOSURE STATEMENT.[36]

A change of fact is not the issue.  The Disclosure Statement contemplated that the sales price might

be more than the initial bid as Debtors clearly stated:

> In the event that a higher and/or better offer is presented by a Prevailing Bidder at
> the Auction, the Debtors will seek to have the Bankruptcy Court approve the same
> percentage allocation between the Assets of the Debtors.[37]

Thus, this provision does not support Debtors' right to modify the allocation method.

Debtors point to yet another disclaimer in the Plan which  reads:

> AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER
> ACTIONS OR THREATENED ACTIONS, IT IS THE DEBTOR'S POSITION
> THAT THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE
> CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY,
> STIPULATION OR WAIVER BUT RATHER AS A STATEMENT MADE IN
> SETTLEMENT NEGOTIATIONS.[38]

FBT and Bay Bridge are not alleging that Debtors stipulated or waived any position as to a fact, nor

are they alleging that Debtors have admitted to any legal position.  Instead, both seek to bind

Debtors to a methodology of plan implementation based on the Debtors' own representations.  The

Court finds that nothing in the Disclosure Statement or Plan indicates that Debtors might propose

a different allocation. As a result, Debtors' position is clearly inconsistent with its representations

in the Disclosure Statement.

---

[36] *Id.* at 8.

[37] *Id.* at 18-19.

[38] *Id.* at 8.

Debtors also argue that FBT and Bay Bridge are attempting to enjoin this Court's consideration of a differing allocation. FBT and Bay Bridge have not objected to the prerogative of this Court. Instead, they seek to estop Debtors from *proposing* a different allocation. That is something different than objecting to the Court's right to question any proposal the Debtor submits.

### b. Did the Court, FBT, or Bay Bridge Justifiably Rely on the Disclosure Statement?

### i. The Court's Reliance

Approval of the Disclosure Statement was based in part on the representations by 800 Bourbon and Oz as to the methodology for dividing the sale proceeds following a package sale of assets. However, confirmation was also dependent on 800 Bourbon and Oz's representations that all secured and unsecured claims, administrative and priority debt would be satisfied. This was achieved through the escrow of a lesser sum for Bay Bridge. These provisions were critical to the Court's decision to confirm the Plan.

The Oz and 800 Bourbon cases were jointly administered in an effort to minimize common administrative costs. Nevertheless, each Debtor operated and accounted for its revenues and expenses without reference to its sister debtor. After each Debtor explored the possibility of selling assets separately, Debtors determined that a global sale of substantially all the assets held by both would garner a greater return to creditors.

One difficulty raised by a global sale of both estates' assets was how to divide the proceeds when the interested parties in each estate were so different. While 800 Bourbon and Oz share common ownership, the creditors of each estate are not the same. Somewhat distinctly, a major secured creditor of 800 Bourbon (Bay Bridge) does not hold a claim against Oz or its assets. Similarly, a major secured creditor of Oz (Thomas and Carolyn Moore) only holds a security interest

14

in one of Oz's assets, the Warehouse.  In addition, the priority claims in each case are wholly different.  For example, the City of New Orleans filed a proof of claim for property taxes against 800 Bourbon.  In the Oz case, the City asserted a separate and distinct claim for *ad volorem* taxes.  Oz also has a substantial administrative claim based on the efforts of a state court receiver, while 800 Bourbon has none.  Because Oz is an operating bar, it also has trade and other unsecured debt not present in the 800 Bourbon case.

For the above reason, the allocation of the price was of particular concern to this Court when it considered the Motion to Sell, Disclosure Statement, and Plan.   By placing the methodology for division of the proceeds in the Disclosure Statement, Debtors' position regarding the relative worth of the assets was provided.  Certainty as to Debtors' position post-sale was also given.

From the Court's perspective, the methodology for allocation provided it with a rational basis for fairly distributing any gains on sale.  While not binding on the Court, it allowed the Court to test for conflicts of interest; ascertain if the Plan was likely to satisfy priority, administrative, and secured claims in each estate; and balance the competing interests of two (2) separate estates.  Satisfying these concerns was a critical part of the Court's agreement to approve the sale process and grant confirmation.

When problems arose with the appearance of Bay Bridge, Debtors offered a solution to their obvious bar to confirmation by negotiating an escrow while still paying all claims.  It should be noted that this compromise was based on the worst case scenario.  At the time this agreement was proposed, the auction had not occurred and all parties were motivated to achieve both a sale and confirmation.[39]

---

[39]  Bay Bridge only holds an *in rem* claim against 800 Bourbon.  In order to maximize its recovery, Bay Bridge needed to marshal as much of FBT's debt as could be paid against Oz's

Debtors' representation regarding the methodology they would use to divide the sale proceeds is a classic example of a material representation presented to a court in an effort to win that court's approval for the requested relief. As a result, the second prong of FBT and Bay Bridge's argument for judicial estoppel is satisfied. Perhaps more importantly, the same facts support a finding that the creditors justifiably relied on these representations in voting for the Plan's approval.

### ii. FBT and Bay Bridge Justifiably Relied on the Disclosure Statement

FBT and Bay Bridge contend that in withdrawing their objections to confirmation, they relied on the allocation proposed by Debtors in the Disclosure Statement. It is clear that the allocation method provided by Debtors in their Disclosure Statement was designed to provide creditors of each estate reassurance as to how the sale proceeds would be divided and a method to calculate their potential distribution. FBT goes so far as to argue that its vote was changed from a rejection of the Plan to an acceptance based on this very explanation.[40] In the case of Bay Bridge, the compromise provided a fund greater than what it might expect if the Property were sold at foreclosure by FBT or even in the open market. Although Debtors reserved the right to challenge the amounts in escrow, Bay Bridge was justified in assuming the reservation would be based on the allocation method set forth in the Disclosure Statement.

_____

estate. The corresponding reduction in FBT's secured claim against 800 Bourbon created value for Bay Bridge's security interest. On the other hand, Debtors wanted to satisfy FBT entirely from 800 Bourbon's estate freeing Oz from any responsibility on the same obligation and generating value for equity. The problem with both is that administrative claims had to be paid in order to confirm. In addition, in order to avoid re-solicitation of the plan and votes, 800 Bourbon and Oz's unsecured classes could not be impaired because both had solicited votes with a representation of full payment. Thus, each party had a reason to compromise.

[40] _See_ 14-12770, P-231, 297, 303.

16

For the very reasons set forth in *Hargrove*, FBT and Bay Bridge had the right to rely on Debtors' representations when voting to support Debtors' Plan.   The Plan proposed to sell FBT and Bay Bridge's collateral in a package with other assets.   Under the Bankruptcy Code, FBT and Bay Bridge were entitled to receive the value of their collateral on their secured claims.   The Debtors' position on how the sale proceeds would be divided was crucial to its proof that the secured interests of FBT, Bay Bridge, property taxes and Moore were protected even in a global sale.   Since this was a requirement for confirmation, FBT and Bay Bridge were justified in relying on the representation by Debtors in the Disclosure Statement as to the allocation of the proceeds.

### c.  Were Debtors' Representations Inadvertent?

Debtors contend that their change in position is inadvertent because they did not know that the packaged assets would bring such a high price at auction.[41]  This argument reveals Debtors' motives for changing position.

If the sale proceeds are allocated as Debtors now propose, 800 Bourbon's administrative and unsecured creditors will not be paid.[42]   Bay Bridge will receive payment substantially below the amounts held in escrow.  At the same time, all of Oz's creditors will be paid in full and a substantial amount will remain to distribute to equity holders.   If allocated according to the Disclosure Statement, creditors in both cases will be paid while equity's overall distribution falls.

In the Disclosure Statement, Debtors clearly contemplated the possibility that the assets might sell for more than the initial bid.  In an effort to provide for just that possibility, Debtors

---

[41] Case 14-12770, P-280.

[42]  The Court notes that a finding of prejudice to a party is not required for judicial estoppel as it is designed to protect the integrity of the courts.  *Point Wylie Co.*, 78 B.R. at 460. Equitable estoppel, on the other hand, protects parties who may be prejudiced by a change in position.  *Id.*

proposed a formula for dividing any sale price between the estates and assets within those estates.

That the assets were sold for a price well in excess of the initial bid does not constitute mistake, nor

does it allow Debtors to marshal the sale proceeds in a different fashion.

      The Court finds that Debtors are both judicially and equitably estopped from proposing a

different allocation than represented in the Disclosure Statement.

### B. Allocation

      Although Debtors are estopped from taking an inconsistent position, the Court is not bound

by the terms of the Disclosure Statement.  Nevertheless, unless there is a difference of opinion as

to the terms of the Plan, the proposal for allocation would lead to absurd results, or a material change

in circumstance warrants revision, this  Court should apply the terms of the Plan based on the

interested parties' understanding at the time of confirmation.  For the reasons set forth below, the

Court does not believe that the application of the method proposed in the Disclosure Statement will

lead to absurd results.  Nor does it find that a material change in circumstance warrants revision.

      The sale price of the packaged assets was $8,175,000.00.  After several parties had examined

Oz's operations (including its books and records) as well as the Property, Debtors' received an offer

of $4,750,000.00. Thus, in the Disclosure Statement, Debtors estimated the value of the assets at

$4,750,000.00.  This value was determined by separately appraising each of the assets offered for

sale and after inviting offers from the public.

      The only asset included in the package of sold assets and belonging to 800 Bourbon is the

Property.  The Disclosure Statement estimated its value at $3,600,000.00.  However, Debtors seek

to cap the proceeds available to 800 Bourbon by tying them to an appraisal of the Property by

18

Bradley D. Bird, MAI, SRA, for $3,475,000.00.[43]  According to Debtors, since the appraised value

of the Property was $3,475,000.00 at the time of the auction, any increase in the auction price can

only be explained by their miscalculation of Oz's value.  Argued another way, Debtors contend that

since 800 Bourbon's sole asset, the Property, is readily susceptible of appraisal, the distinction in

price must be attributable to the intangible assets held by Oz, *i.e.* its goodwill and trade name.

To support this position, Debtors offered the testimony of their accountant,  Patrick Gros.

While Gros is not an expert in corporate valuation, he was qualified as an expert in restaurant

accounting.  His testimony began by explaining how Debtors will report the sale on their respective

tax returns.  Because the sale did not delineate the price paid for the various assets, Generally

Accepted Accounting Principles ("GAAP") require Debtors to make that determination.  Gros

testified that this is accomplished by using the appraised values for each tangible asset.  If in

aggregate those do not equal the sale price, GAAP instructs that the difference be placed into

goodwill.  In essence, goodwill is the plug category when a sale price cannot be justified by the

aggregate appraised value of the assets.

While GAAP is instructive when reporting a gain on sale, in this circumstance it is not

controlling.  First, the tax consequences of this sale have little effect on how the sales price is

allocated.  Because Debtors have common ownership and the sales will be in excess of the basis of

the assets regardless of allocation, taxes will not be affected by allocation.

A common method for estimating the value of an ongoing business is to use a multiple of

earnings approach.  After adjustments to annualize expense savings made by Oz during the

administration of its case, Gros concluded that  Oz had annual earnings of $383,184.26. While Gros

---

[43] Exh. D2.

is not an expert in valuation, in this Court's experience, a rough valuation of an ongoing concern is typically three (3) to five (5) times yearly earnings. This indicates that Oz's value is roughly $1,915,920.00.

Bay Bridge contends that Oz's value is $1,547,082 based on the appraisal of Ellis J. Roussel, CPA, CVA.[44] While Roussel was qualified as an expert in commercial business valuation, due to his limited access to information, he stopped short of opining as to the value of Oz. Instead, he offered a calculation method based on market driven economic and risk factors or a capitalization of earnings approach.

Roussel's calculation requires determination of Oz's annualized net income. Due to the limited access he had to Oz's books and records, he did not dispute Gros' calculation of net income. Roussel then applied a capitalization rate to earnings in order to calculate value. The capitalization rate was calculated by using several components. First is the risk free rate, or the rate paid on investments that bear little to no risk of repayment. Then, an additional rate of return is added to attract equity investment. Next, risk factors to repayment based on the specifics of Oz and its industry are added and then reduced for a long term investment factor. Finally, a size premium based on the amount of the loan is added. The capitalization rate calculated by Roussel is 14.62%.[45]

Using the earnings figure calculated by Gros and reducing for taxes, Oz's after tax income is $270,420.00. The capitalization rate is then divided into the after tax income resulting in a value of $1,849,658.00. Roussel then increased this value by ten percent (10%) as a control premium.

---

[44] Exh. 14.

[45] Roussel did not initially add an industry or company specific factor to the capitalization rate but testified that if added, he would estimate an additional 4% would be appropriate. However, if the capitalization rate is increased, the control premium is reduced to 10%.

A control premium is the degree to which a company will increase in value once control is vested in unified ownership.  The owners of these Debtors have been fighting for control of the companies for years.  Two (2) bankruptcies and a state court receivership later, the owners were finally forced to sell their businesses in order to pay off debts.   Roussel explained that he used a large control premium because of this history.[46]  He assumed that the infighting between the owners affected the earning potential of the business.  As a result, he also assumed that once the business was sold to a single owner, its income would increase by as much as ten percent (10%).

According to Rousell's methodology, the final value of Oz is $2,034,620 to which the value of the furniture, fixtures, inventory and warehouse[47] are added yielding a final value of $2,534,620.00.

Adding the appraised value of Oz to the value of the Property results in a total value of $5,909,620.00, an amount substantially less than the $8,175,000.00 sale price.  Thus, even diverting from Debtors' originally estimated values, some allocation of the excess price has to be made.  Debtors argue that only Oz has the potential for an increase in value over and above its appraisal.  The Court disagrees.

While 800 Bourbon's property is real estate, it too has the potential to increase in value over and above expectations.  800 Bourbon's asset was valued based on the income it could generate and comparable sales data.  While this is the accepted method of valuing real estate, no one would

---

[46]  Originally Roussel's control premium was 40% but was reduced to 10% when the capitalization rate was increased for industry and company specific risk factors.

[47]  Warner testified that she believed the Warehouse to be worth $500,000.00.   Warner was not qualified as an expert, so her opinion is merely a lay opinion.  No recent appraisal of the Warehouse was submitted.  Oz purchased the Warehouse on March 20, 2013, for $325,000.00.  The Court finds $325,000.00 to be the current value of the Warehouse.

seriously argue that either factor will remain constant.  Appraisals capture the value of an asset for a snapshot in time.  Time will tell whether or not the value today rises or falls, but nothing in the record supports Debtors' view that only Oz's assets have the potential for increase in value.

Debtors' assets were sold as a package, rather than piecemeal.  Taking the Property's or Oz's appraised value and allocating the rest to the other would not account for the synergy of the package.  The Court finds that because the assets of both Debtors were combined, the total effect was greater than the sum of the individual pieces.  As a result, the increased value should be apportioned between them.

Finally, how should the Court allocate the sale proceeds?  The Disclosure Statement places a value on Oz's assets at $1,150,000.00 while the valuations calculated though a multiple of earnings or capitalization rate  approach result in values between $1,915,920.00 and $2,534,620.00.  Using any of these values to divide the sale proceeds *pro rata* with 800 Bourbon has no effect on the creditors of Oz as they will be fully paid.  However, deviating from the approach contained in the Disclosure Statement will affect 800 Bourbon's creditors.

The methodology for allocation of the price contained in the Disclosure Statement does not adversely affect Oz's creditors; however, any change in approach will adversely affect  800 Bourbon's creditors.  Further, application of the represented method does not lead to absurd results.  The Court will apply the methodology contained in the Disclosure Statement.  The sales price will be allocated $6,195,832.00 (75.79%) to 800 Bourbon and $1,979,168.00 (24.21%) to Oz.  The Court will enter a separate Order in accord with this ruling.

New Orleans, Louisiana, November 20, 2015.

Hon. Elizabeth W. Magner
U.S. Bankruptcy Judge